# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PERRY D. SCOTT,

      Plaintiff,

    v.                              Case No. 04-C-373

H&R BLOCK MORTGAGE CORPORATION,

      Defendant.

## DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on April 13, 2004, when the plaintiff, Perry D. Scott, ("Scott") filed a complaint in the United States District Court for the Eastern District of Wisconsin alleging that he was discriminated against on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964. Scott further alleges that he was treated differently than other like employees who are not of a protected class, in violation of 42 U.S.C. § 1981. Specifically, plaintiff alleges that the defendant terminated him because he is an African American.

Currently pending before the court is the defendant's motion for summary judgment which is fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment contained responses to the

defendant's proposed findings of fact as well as objections to a number of the defendant's proposed findings. In its reply, the defendant responded to the plaintiff's objections to the defendant's proposed findings of fact. Before reaching the merits of the defendant's motion, this court will address the plaintiff's evidentiary objections.

Specifically, the plaintiff argues that a number of the defendant's proposed findings of fact are inadmissible because: (1) certain exhibits filed with the defendant's motion for summary judgment, and relied upon as support for some of the defendant's proposed findings of fact, were neither attached to nor referenced in affidavits; (2) Scott Hodgden's ("Hodgden") affidavit contains self-serving and conclusory statements; and (3) statements referenced in Hodgden's affidavit and statements made in certain exhibits constitute hearsay. The plaintiff's first objection is now moot, as the defendant, with its reply, filed new affidavits that have the relevant exhibits attached thereto. Those exhibits are now properly authenticated and will be considered by the court.

Second, although Hodgden's affidavit does contain self-serving statements and his own conclusions about Scott's performance as team leader, it will be considered because it meets the requirements of evidence on summary judgment. The Court of Appeals for the Seventh Circuit has stated that "self-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are 'without factual support in the record.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)). The record, however, "may include the self-serving affidavit itself, provided that the affidavit 'meets the usual requirements for evidence on summary judgment–including the requirements that it be based on personal knowledge and that it set forth specific facts.'" *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004) (quoting *Payne v. Pauley*, 337 F.3d 767, 773

2

(7th Cir. 2003). Hodgden's affidavit meets both of these criteria: it is based on his personal knowledge and sets forth specific facts relevant to the disposition of the defendant's motion. Thus, this court will consider Hodgden's affidavit, but it will not deem all of the proposed findings of fact based upon Hodgden's affidavit undisputed, as the defendant has requested.

Third, plaintiff is correct that some statements contained in Hodgden's affidavit would constitute hearsay, if those statements were offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). However, these statements are not being offered to prove the truth of the matter asserted. Rather, the statements are offered show Hodgden's state of mind when he evaluated Scott's performance as team leader of the Milwaukee office, and therefore, those statements are admissible. *See e.g.*, *Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (holding that statements not offered to prove truth of the matter asserted, but rather, offered to show employer's "state of mind at the time she was evaluating [employee's] performance" were nonhearsay and thus, admissible).

In light of these evidentiary findings, a review of the parties' respective proposed findings and the responses thereto reveal that the following are the material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.

H&R Block Mortgage Corporation ("H&R Block") is a nationwide residential mortgage lender with branch offices located throughout the United States. (Def.'s Proposed Finding of Fact ("DPFOF") ¶ 2.)

Scott was formerly employed with H&R Block as the Team Leader (i.e., branch manager) of H&R Block's Branch Office located in Wauwatosa, Wisconsin ("the Milwaukee branch office") from January 1, 2002 until July 31, 2003. (DPFOF ¶ 3.)

3

Scott was originally hired by H&R Block on February 7, 2000, to work as a loan officer at the Sterling Heights, Michigan, H&R Block branch office. (DPFOF ¶ 4.)

Scott was promoted from Loan Officer to the position of Team Leader of the new Milwaukee branch office effective January 1, 2002. (DPFOF ¶ 5.)

In May of 2002, during a company-wide restructuring of all H&R Block districts around the United States, District Manager James Weber ("Weber") became Scott's direct supervisor and District Manager. (DPFOF ¶ 6.)

On May 15, 2003, during an additional company-wide restructuring of all H&R Block districts around the United States, District Manager Scott Hodgden ("Hodgden") replaced Weber as Scott's direct supervisor and District Manager. (DPFOF ¶ 7.) From May 15, 2003 until July 31, 2003, when Scott was terminated, Hodgden was Scott's immediate supervisor. (DPFOF ¶ 28.)

On July 28, 2003, Hodgden informed Scott that he would be removed as Team Leader of the Milwaukee branch office. (DPFOF ¶ 9.) Hodgden informed Scott that there were "various reasons" for his decision to remove Scott from the Team Leader position, and stated that "it's not a good fit. We need to move in the right direction." (DPFOF ¶ 16.) At that time, Hodgden allegedly offered Scott the opportunity to take a demotion back to his position as a H&R Block Loan Officer, including a guaranteed position back in Sterling Heights, Michigan and $3,000.00 in relocation expenses. (DPFOF ¶ 10.) Scott states that the loan officer position in Sterling Heights, Michigan was mentioned as a "possibility," and disputes that the position was guaranteed. (Pl.'s Resp. to DPFOF ¶ 10.) Scott did not inquire about nor did he pursue a position as a loan officer in Sterling Heights, Michigan after July 28, 2003. (DPFOF ¶12; Pl.'s Resp. thereto.)

4

On July 22, 2003, Hodgden allegedly reached the conclusion that he had "lost all confidence in [Scott's] ability to lead the Milwaukee branch…[and] it was in the company's best interest to replace [Scott] and rebuild the Milwaukee branch from the top down."  (DPFOF ¶ 15.)

Scott disputes that the decision to remove him as Team Leader was made on July 22, 2003, and disputes that the decision to remove him as Team Leader was based upon his ability to lead the Milwaukee office. (Pl.'s Resp. to DPFOF ¶ 8.)  Scott alleges that in March of 2003, after Scott reprimanded Eugena T. Perkins for insubordination, Weber berated Scott, threatened his job, and told him to take "his black ass home."  Scott alleges that the next day, Weber sent Scott a letter of reprimand in retaliation for Scott reporting the racial slur to Sam Hussain, Weber's supervisor.  Scott alleges that "this is when the campaign to terminate Scott began."  (Pl.'s Resp. to DPFOF ¶ 14.)

Scott further alleges that when Hodgden met Scott for the first time on May 28, 2003, Hodgden told Scott "that he's not Jim Weber" and that "what happened between you and Jim Weber is not my concern . . . We'll start from this point on."   (Pl.'s Resp. to DPFOF ¶ 14; Scott Dep., at 150.)  Scott argues that in light of Weber's alleged racial slur, and Hodgden's alleged comment that "he is not Jim Weber," that (1)  Hodgden spoke with Weber about Scott, (2) Weber and Hodgden decided that Scott should be terminated, and (3) it was decided that Hodgden would terminate Scott. (Pl.'s Resp. to DPFOF ¶ 8.)

H&R Block alleges that on July 22, 2003, Hodgden created a list of the reasons for his decision to remove Scott as the Team Leader of the Milwaukee branch office ("Exhibit A").  Those nine reasons were:

  1.  I asked he move his desk (which Jim had previously done as well) out on to the
  sales floor to be more accessible to his staff.  This has not happened.

5

2. We have sent Perry to Pleasanton several times [for training] to sit with successful TL's [i.e., Team Leaders] and he has not followed through with any of what he has learned in his branch.

3. Perry has not cultivated the local market and has developed terrible rapport with the tax side in his area. I have received several complaints regarding customer service from his branch.

4. After my visit in May one of the main action items was to recruit LO's [i.e., Loan Officers]. 60 days later and he hasn't done anything. The other action item was to do one on one coaching with each associate at their desks daily. From feedback I have received from the staff this is not happening either.

5. Perry went on vacation the last week for docs out. This is bad timing but if done right can be done. However, Perry didn't leave anybody in charge and left no direction for a new employee. The feedback from his staff was Perry made a comment they were going to have a bad month so he just gave up.

6. Perry did not follow the 5-day planner and the feedback I received from Elizabeth Perkins was Perry "flat out doesn't know what he's doing."

7. Perry informed Elizabeth that she was exempt and instructed her to alter her time card and not report her OT.

8. Perry has experienced tremendous turnover in his branch. We have lost several good people due to his management style. Perry has poor people skills and simply doesn't get it.

9. I have lost all confidence in Perry's ability to lead the Milwaukee branch. Milwaukee is an excellent Non-prime market and over the last 2 years we have lost several hundred thousand dollars. I believe it is in the company's best interest to replace Perry and rebuild the Milwaukee branch from the top down.

(DPFOF ¶ 17; Krukowski Aff., Ex. A.) It is undisputed that this list of reasons was never shown to

Scott nor were any of these specific reasons for his termination communicated to him. (Pl.'s Resp.

to DPFOF ¶ 17.) Scott disputes that this list was created on July 22, 2003 because this document was

neither in Scott's personnel file nor was it attached to the defendant's December 8, 2003 response

to Scott's EEOC charge of discrimination. (Pl.'s Resp. to DPFOF ¶ 17.) Scott also disputes the

6

veracity of this document because when it was first produced, in early 2005, it was not attached to any other document. However, on March 2, 2005, the document was produced as an attachment to an e-mail from Hodgden to Hussain dated July 22, 2003. (Pl.'s Resp. to DPFOF ¶ 17.)

H&R Block has proposed numerous findings of fact addressing Scott's performance as team leader prior to May of 2003, that is, when Weber was his manager. However, Hodgden allegedly never had any oral or written communications with Weber regarding Scott's performance as team leader under Weber's supervision nor did Hodgden review any files, e-mails, or any other documents that addressed Scott's performance as team leader under Weber. (DPFOF ¶¶ 31, 32, 33.) Nor did Hodgden have to consult with his supervisor, who may have had access to this information, prior to his decision to remove Scott as team leader. (DPFOF ¶ 35.) Thus, by the defendant's own admission, any evidence addressing Scott's performance as team leader prior to May of 2003, did not and could not have formed the basis for Hodgden's decision to terminate Scott, and therefore, this court will not address those findings. This court, however, will address the proposed findings of fact that relate to the alleged racial slur made by Weber, as those proposed findings may arguably be relevant to Hodgden's decision to terminate Scott.

On March 13, 2003, Weber received a complaint from one of Scott's subordinates at the Milwaukee Branch Office, Loan Officer Eugena T. Perkins, in which Perkins stated that Scott had treated her rudely. (DPFOF ¶ 19.)

On March 13, 2003, Eugena Perkins wrote the following e-mail to Weber:

Hello Jim I do have some concerns about my position here at hrbmc. I have learned an awful lot about mortgages and the industry. However, it is getting increasingly difficult to deal with Mr. Scott on a daily basis.

7

Today, I was on the phone with a client reselling a loan. Perry was coming in the office and overheard my conversation and yells (while I am on the phone) I need to see you on that! After I hang up the phone he yells again I need to see you in my office now Eugena. . . . I am getting increasingly frustrated with the unorganized and disrespectful manner in which Perry continually approaches me, anyhow I did not go in his office he yelled at me and told me to go home, I said no I am not going home I am staying right here. . . . I let him know how irritated I am increasingly becoming with him and his attitude. . . .

It's a great day today and Perry sours the mood whenever he is not having a good day....

Anyhow, Perry gave me a form to sign about insubordination, I will not sign this form. period. I did nothing wrong . . . I am letting you know because you are his manager.. .something needs to be done about the way Mr. Scott talks to employees . . . If I submitted the loan wrong as Perry addressed on the form he handed to me to sign, I will acknowledge my mistakes, however one should not have to continually cope with a manager that talks at you and not with you, about how to improve your submissions . . .

Thank you for your time and consideration.

(DPFOF ¶ 21; Weber Aff., Ex. B.)

After receiving this complaint, on March 14, 2003, Weber sent Scott the following memorandum:

Perry,

This memo is to serve as clarification of several reoccurring issues we are having within the Milwaukee branch, specifically, process implementation, communication with your associates, your inability to accept feedback for development and finally your overall attitude.

Over the last several months you, your associates and myself have been working on establishing a process for your branch. Most recently, in January of 2003 it was decided amongst the group that some new procedures would be implemented. It has come to my attention through my observation and confirmation with your staff that these processes are being ignored. Perry this is extremely serious. You have deliberately ignored my instructions and the processes that we established as a team.

8

The second issue that I want to address is the way your treat your associates. As stated in our company "Code of Ethics and Conduct" we are to treat each other with dignity and respect. Your recent behavior, specifically towards Eugena Perkins shows that you are not portraying such behavior.

Next, is your inability to accept feedback for development. You constantly interrupt me when I speak to you and you ignore my suggestions and instructions. Perry, it is my job as your DM to make you and your branch successful and function at our established productivity standards. With you bypassing my every suggestion, this will not be successful.

My final concern is your overall attitude toward your team, myself and towards your role as a leader in our organization. You have been condescending and have shown a recent lack of motivation. This combination can not be tolerated.

Perry, as I stated earlier, it is my job to help you succeed, but unfortunately this is a two way street and you need to meet me on it. Over the next month, you and I will address the aforementioned areas of concern and work on them. I need to see a continuous improvement with a 100% effort and attitude. By doing such, I hope to see the turn around necessary for the continued operation of the Milwaukee branch.

(DPFOF ¶ 22.) Scott alleges that, on March 13, 2003, after Scott disciplined Eugena T. Perkins, for insubordination and sent her home, Weber berated Scott, threatened his job, and told him to take "his black ass home." The next day, Scott alleges that Weber sent Scott the above letter of reprimand in retaliation for Scott reporting the conversation, including the racial slur, to his supervisor, Sam Hussain. Scott alleges that this is when the campaign to terminate him began. (Pl.'s Resp. to DPFOF ¶¶ 14, 22.)

Scott responded to Weber's e-mail, as follows:

I have read this memo. I feel my side has not been totally heard. Although I disagree with many actuation [sic] placed upon me, I do agree to move forward. So on that note this issue is dead unless you have other concerns. I, also agree I have much room for improve[ment] as a leader. This is the first written feedback I've had of any kind in 3 years as a HRBMC associate. Unfortunately, it's not positive. Jim I respect you as my manager, but I truly feel it's a little difficult talking to you. You appear to get angry with me quickly. I truly believe you, my staff, and of course myself want the Milwaukee branch to succeed. I'm personally willing to change to accomplish

9

this but as you said I can't do it all by myself. It's a two way street. I'm seeking a
better relationship from you and my associates … Perry
I have called you and left you a voice mail…

(Weber Aff., Exh. C.)

The first time that Hodgden personally met or spoke with Scott was on May 28, 2003, at the

Milwaukee branch office. (DPFOF ¶ 39.)

H&R Block alleges that on May 28th or 29th of 2003, Hodgden instructed Scott to move his

desk out of his personal office (which was physically located off of the sales floor at the Milwaukee

branch office) and sit at a new desk with his subordinates out on the sales floor on a daily basis.

(DPFOF ¶ 41.)  H&R Block further alleges that Scott failed to follow Hodgden's instructions and

move his desk out of his office and physically sit at a new desk with his subordinates out on the sales

floor on a daily basis.(DPFOF ¶ 41.)  Scott alleges that he was never asked to move his desk out of

his office to sit on the sales floor.  (Pl.'s Resp. to DPFOF ¶ 41.)

Scott admits that one of his job duties and responsibilities as the Team Leader was to recruit

new Loan Officers for the Milwaukee Branch Office. (DPFOF ¶ 65.  Scott admits, that in May of

2003, Hodgden instructed Scott to recruit more Loan Officers for the Milwaukee branch office.

(DPFOF ¶ 64.)

H&R Block alleges that Scott did not follow Hodgden's specific instruction to recruit more

Loan Officers because at no point on or after May 28 or 29, 2003, did Scott recruit any Loan Officers,

or send even one resume to Hodgden for the position of Loan Officer at the Milwaukee branch office.

(DPFOF ¶ 68.)  Scott alleges that he interviewed several potential loan officers, including Erich

Broemser, Richard Carey, Astrid Lyzzette Cordero, Gena Geyser, David L. Hippensteel, and

Kimberly Lynn Peterson, and in support of this, Scott has produced his notes regarding these interviews as well as the interviewees' resumes. (Pl.'s Resp. to DPFOF ¶ 68; Scott Aff., Exs. 3A-F.)

H&R Block alleges that on May 28th or 29th of 2003, Hodgden instructed Scott to perform one-on-one coaching sessions with all of his subordinates at the Milwaukee Branch Office on a daily basis. (DPFOF ¶ 73.) Scott alleges that he "had always done one-on-one coaching" and he was never instructed by Hodgden to do so. (Pl.'s Resp. to DPFOF ¶ 73.)

Hodgden alleges that he sent Scott an e-mail summarizing his conversation with Scott on May 28th or 29th of 2003, in which Hodgden reiterated his instructions for Scott to work on numerous "action items," i.e. perform one-on-one coaching sessions, move his desk out onto the sales floor, recruit more loan officers, etc. (Hodgden Dep. at 27, lines 8-24.) However, the alleged e-mail detailing the "action items" to be performed by Scott, despite attempts by H&R Block's Information Technology department, allegedly can not be retrieved. (Hodgden Dep. at 29, lines 6-16; Kaas Aff., Ex. 14.)

In June of 2003, Diane Cooley ("Cooley"), the Regional Director of H&R Block Eastern Tax Service, Inc. ("H&R Block Tax") for the State of Wisconsin, contacted Hodgden and informed him of numerous complaints she had regarding Scott. (DPFOF ¶¶ 48,49.) Scott does not dispute that Cooley had complaints regarding him, but adds that Cooley testified that when she learned that Scott had been terminated she was surprised, and that she never told anyone he should be terminated based upon the complaints she made. (Pl.'s Resp. to DPFOF ¶ 49.)

Specifically, Cooley testified that she "was concerned that Mr. Scott was not bought into the partnership [between H&R Tax and H&R Home Mortgage], [and] that [Scott] did not believe that working with tax was how he was going to grow his business." (Cooley Dep. at 31-32.)

11

Prior to July 22, 2003, Hodgden allegedly received two customer complaints regarding the Milwaukee branch office. The customers were allegedly frustrated with the length of time it was taking to close their mortgage loan applications in the Milwaukee branch office. (DPFOF ¶ 61.)

Scott went on vacation the entire next week of July 21, 2003, to July 28, 2003. (DPFOF ¶ 81.) Milwaukee Branch Office Account Manager Renee Williams also went on vacation the entire week of July 21, 2003 to July 28, 2003. (DPFOF ¶ 82.)

On July 21, 2003, new Account Manager Elizabeth Perkins (Perkins had only worked in the Milwaukee branch office since July 7, 2003) called Hodgden to inform Hodgden that Scott had told her that (1) she was an exempt employee for purposes of reporting overtime and collecting overtime pay; (2) she could not report any overtime that she had worked; and (3) she was instructed to alter her reported hours so that she would not receive pay for any overtime that she had actually worked. (DPFOF ¶ 83.)

On July 21, 2003, Hodgden contacted Senior Human Resources Generalist Karen Baraga ("Baraga") about Elizabeth Perkins's complaint, and subsequently, Baraga sent an e-mail to the entire Milwaukee branch office about reporting and collecting overtime pay, requesting that every employee report any overtime that they had worked and had not been compensated for. (DPFOF ¶¶ 84, 85.)

On July 21, 2003, Hodgden called Elizabeth Perkins back and she informed Hodgden that:

(I)     She had been given no direction from Scott before he left on vacation;
(ii)    She had not been sufficiently trained and did not know how to package mortgage loan applications secured from clients by the Loan Officers and other necessary documentation, or how to send the mortgage loan application files to external H&R Block underwriters for final processing and potential approval of the client's mortgage loan application;

12

(iii)    That things were "frantic" at the Milwaukee Branch Office because she was the only Account Manager at the Milwaukee Branch Office to process mortgage loan applications, and the Loan Officers were upset because the loan applications weren't being processed fast enough;

(iv)    She didn't know what to do to fix the situation;

(v)    Scott "flat out doesn't know what he is doing;" and

(vi)    She was the only Account Manager at the Milwaukee Branch Office while Account Manager Renee Williams and Plaintiff were on vacation during the entire week of July 21, 2003, through July 28, 2003.

(DPFOF ¶ 87; Perkins Depo. at 41, lines 7-8, 14-25; at 43, lines 7-20; at 46, lines 8-25; at 47, lines 1-9, 25; at 48, lines 1-6.)

H&R Block alleges that, during the week of July 21, 2003 to July 28, 2003, Elizabeth Perkins was the only Account Manager working at the Milwaukee Branch Office, and that she was not properly trained by Scott prior to Scott's departure for his vacation.  (DPFOF ¶¶ 89, 90.)  Scott alleges that there was a senior account manager from Chicago named Denise (last name unknown) who assisted Elizabeth Perkins and helped train her while Scott was on vacation.  (Scott Aff. ¶ 18)

Based on Hodgden's discussion with Elizabeth Perkins on July 21, 2003, Hodgden concluded that Scott did not follow the five-day planner for training Elizabeth Perkins as a new H&R Block employee and Account Manager. (DPFOF ¶ 93.)

On July 21, 2003, Hodgden also called Loan Officer Tom Wendt ("Wendt") at the Milwaukee branch office.  (DPFOF ¶ 94.)  Wendt informed Hodgden that prior to Scott leaving for vacation the entire week of July 21-July 28, 2003, Scott told everyone in the Milwaukee branch office that they were going to have another bad month and were not going to meet their numbers again so everyone should just go on vacation too. (DPFOF ¶ 95.)

13

Hodgden asked Wendt about the amount of coaching, if any, that Scott was providing to his subordinates on a daily basis, as Hodgden had allegedly instructed Scott to start doing during Hodgden's visit in May of 2003. (DPFOF ¶ 96.)

On July 21, 2003, Wendt informed Hodgden that, at most, Scott would leave little sticky notes and instructions on employees' computer screens and mortgage loan files, or shove papers on their desk when the Loan Officers were occupied on the phone with potential clients. (DPFOF ¶ 97.)

Based on his discussion with Wendt on July 21, 2003, Hodgden concluded that Scott did not follow his May 2003 instructions and failed to perform one-on-one coaching sessions with Wendt and the other subordinates at the Milwaukee branch office. (DPFOF ¶ 98.)

On July 21, 2003, Scott Hodgden also called and spoke with Loan Officer Milka Krecak at the Milwaukee branch office. (DPFOF ¶ 100.)

Based on his discussion with Milka Krecak on July 21, 2003, Hodgden concluded that Scott did not follow his May 2003 instructions and failed to perform one-on-one coaching sessions with Milka Krecak and Scott's other subordinates at the Milwaukee Branch Office. (DPFOF ¶ 101.)

As of July 28, 2003, there were only six (6) people working in the Milwaukee Branch Office: Scott, Elizabeth Perkins, Milka Krecak, Shann Uran, Renee Williams, and Tom Wendt. (DPFOF ¶ 102.)

After Scott's official start date of January 1, 2002, as the new Team Leader of the Milwaukee Branch Office until July 31, 2003, employee turnover at the Milwaukee Branch Office consisted of hiring and subsequently losing at least 11 other employees to include: (1) Eugena Perkins; (2) Kennan Walker; (3) Xandra Moore; (4) Marcy Salmon; (5) Detrell Bellinger; (6) Vicky Gee; (7) Anita Burton; (8) Jeff George; (9) Andrea Hawthorne; (10) Antionette Shambeau; and (11) Cecilia

14

Weaver. (DPFOF ¶ 103.) Scott disputes that the departure of the above-listed individuals had anything to do with Scott's performance as Team Leader. (Pl.'s Resp. to DPFOF ¶ 103.)

By July 22, 2003, Hodgden concluded that he lost all confidence in Scott's ability to lead the Milwaukee branch office and that it was in the company's best interest to rebuild the Milwaukee branch office from the top down. (DPFOF ¶ 108.) Scott disputes that this was the real reason why he was terminated. (Pl.'s Resp. to DPFOF ¶ 108.)

There were only five H&R Block Mortgage Corporation branch offices located in Hodgden's district in May 15, 2003 to July 31, 2003. (DPFOF ¶ 109.)

The five H&R Block branch offices located in District Manager Scott Hodgden's district in May 15, 2003, to July 31, 2003, were located in Milwaukee, Wisconsin (Team Leader Perry Scott), Schaumburg, Illinois (Team Leader Gerry Collins), Chicago, Illinois (Team Leader Brett Robinson), Minnetonka, Minnesota (Team Leader Scott Harer), and St. Louis, Missouri (Team Leader Brian Jones). (DPFOF ¶ 110.)

Hodgden alleges that he never lost confidence in any of the other four Team Leaders' abilities to lead their respective branch offices in 2003. (DPFOF ¶ 114.) Scott disputes that Hodgden's "loss of confidence" is the real reason for Scott's termination. (Pl.'s Resp. to DPFOF ¶ 114.)

Scott admits that he has no idea what the morale level was at any of the other H&R Block branch offices compared to the Milwaukee branch office. (DPFOF ¶ 151.) Nor does Scott know what the customer service level was at the other branch offices, and he does not know how many customer complaints were received at the other branches. (DPFOF ¶ 154.)

Scott admits that he is only speculating that the level of local competition for the residential mortgage loan business at the Milwaukee branch office is similar for the other branch offices in his

15

district. (DPFOF ¶ 159.)  Scott also admits that local economies and local real estate prices vary by H&R Block district and vary by branch office in each district. (DPFOF ¶ 160.)

The Milwaukee branch office had a profit of $18,239.00 for the First Quarter of Fiscal Year 2003. (DPFOF ¶ 165.)  Nevertheless, H&R Block alleges that the aforementioned "paper" profit number is merely "the aftermath of accounting and allocation methodology[,]" and does not demonstrate any positive job performance on Scott's part as Team Leader of the Milwaukee branch office in 2003.  (DPFOF ¶ 166.)

Scott had the worst and lowest "Total Revenue" generation for the entire First Quarter of Fiscal Year 2003 (May 1, 2003 to July 31, 2003) out of all five Branch Managers in Hodgden's district. (DPFOF ¶ 179.)  However, this statistic was not known until August of 2003, therefore raising the inference that it was not a reason for Scott's termination. (Pl.'s Resp. to DPFOF ¶ 179.) Plaintiff had the worst and lowest "Total Revenue" generation for the entire month of July 2003 out of all five Team Leaders in Hodgden's district during this same time period. (DPFOF ¶ 185.)  This statistic also was not known until August of 2003, therefore raising the inference that it was not a reason for Scott's termination.  (Pl.'s Resp. to DPFOF ¶ 185.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts." *Albiero v. City of Kankakee*,

246 F.3d 927, 932 (7th Cir. 2001) (internal quotations omitted). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. To prevail at the summary judgment stage on his race discrimination claim under Title VII or § 1981,[1] Scott must demonstrate H&R Block's discriminatory intent under either the "direct" method or the "indirect" method of proof.

A plaintiff proceeding under the "direct method may rely on two types of evidence: direct evidence or circumstantial evidence." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*,

---

[1] Scott's § 1981 claim and his Title VII claim will be addressed together, as they both will be evaluated under the same legal standard. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) (stating that "[b]ecause we evaluate § 1981 claims under the same rubric as Title VII claims, we need not address them separately").

18

150 F.3d 747, 751 (7th Cir. 1998) (internal quotations omitted). Direct evidence is evidence that may "'be interpreted as an acknowledgment of discriminatory intent by the defendant.'" *Rudin*, 420 F.3d at 720 (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Simply stated, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000)). Admittedly, direct evidence establishing an employer's discriminatory intent is rare.

A plaintiff may also prevail under the direct method by establishing a "convincing mosaic" of circumstantial evidence that "allows a jury to *infer* intentional discrimination by the decision-maker." *Id.* (emphasis added). Circumstantial evidence "may come in the form of 'suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group.'" *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 736). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

A plaintiff proceeding under the indirect method, as established in *McDonnell Douglas*, must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of a protected class. *See Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005). "The failure to establish any one of the initial four elements [of a prima facie case] defeats a discrimination claim." *Bio v. Federal Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). If the plaintiff establishes a prima facie case, the burden of production

19

then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *McDonnell Douglas*, 411 U.S. at 802. Then, if the defendant articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Ineichen*, 410 F.3d at 961.

To demonstrate pretext, Scott must show that H&R Block's articulated reason for demoting/terminating him either: "(1) had no basis in fact; (2) did not actually motivate [his] discharge; or (3) was insufficient to motivate [his] discharge." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). Pretext requires more than a showing that the decision was "mistaken, ill considered or foolish . . . so long as [the employer] honestly believes [in the reason presented], pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). "Pretext is 'a dishonest explanation, a lie rather than an oddity or an error.'" *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)). Simply put, "pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir.2001) (internal quotations omitted). It is also worth noting that, although the burden of production shifts under the *McDonnell Douglas* test, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Turning to the facts of this case, Scott has not produced any evidence that could "be interpreted as an acknowledgment of discriminatory intent by [Hodgden]," and therefore, has not

20

produced any direct evidence of intentional discrimination.[2] *Troupe*, 20 F.3d at 736. Rather, Scott argues, under the direct method, that he has established "a convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination by Hodgden.

In support of this argument, Scott has presented evidence that on March 13, 2003, after Scott disciplined Eugena T. Perkins[3] for insubordination, Weber berated Scott, threatened his job, and told him to "take his black ass home." (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Br." at 8; Scott Dep. at 144, lines 17-24.) After this conversation with Weber, Scott went home and called his regional manager, Sam Hussein, and reported the incident to Hussein. (Pl.'s Br. at 8; Scott Dep. at 145, lines 14-24.) That same afternoon Weber dictated a memo to Karen Baraga, a Senior Human Resources Generalist, outlining Weber's concerns with Scott's operation of the Milwaukee branch office. (Pl.'s Br. at 8; Weber Dep. at 68, lines 17-21.) The next morning, on March 14, 2003, Weber e-mailed the memo to Scott. (Weber Dep. at 70, lines 16-24.) Scott argues that Weber's memo was sent in retaliation for Scott's reporting of Weber's racial slur to Hussain, Weber's supervisor.

_____

> [2]    In his brief, Scott seems to argue that there is direct evidence of discrimination in this case. (Pl.'s Br. at 8.) Scott, however, has confused the direct method of proof with direct evidence of discrimination. This confusion is understandable, as "[t]here are several cases that arguably conflate the direct method with direct evidence." *Rogers*, 320 F.3d at 754; *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 941 (7th Cir.1997) ( "The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of 'direct' evidence . . . which in an employment discrimination case would normally require an admission.").

> [3]    Throughout his brief, Scott alleges that Eugena T. Perkins is a white female. (Pl.'s Br. at 8.) H&R Block, however, in its reply brief, alleges that Eugena T. Perkins is an African American female. (Def.'s Reply Br. at 3.) On her voluntary self-identification form, Eugena T. Perkins self-identified as both Black/African American and White/Caucasian. (Baraga Aff., Ex. L.) This documentary evidence regarding Eugena T. Perkins's race is relevant only the extent that it undermines Scott's argument that Weber berated Scott and threatened his job because he was angry that Scott had disciplined a white woman. (Pl.'s Br. at 13.)

21

Scott has also presented evidence that on May 28th or 29th of 2003, while Hodgden was visiting the Milwaukee Branch Office , Hodgden told Scott "that he's not Jim Weber" and that "what happened between you and Jim Weber is not my concern . . . We'll start from this point on." (Pl.'s Br. at 9; Scott Dep. at 150, lines 15-21.) Additionally, there is evidence that, on July 28, 2003, Scott was told that he was being demoted/terminated for "various reasons . . . it's not a good fit. We need to move in the right direction." (Scott Dep. at 228, lines 21-24.) Approximately a week later, Hodgden allegedly told Scott that he was fired for "production reasons." (Scott Dep. at 234, lines 7-10.) Scott also relies upon the fact that Hodgden's alleged "summary of action items" e-mail and Hodgden's alleged follow-up e-mails were not attached to H&R Block's December 8, 2003 response to Scott's EEOC claim, as support for his "mosaic" of circumstantial evidence.[4] (Pl.'s Br. at 11.) As support for his "mosaic," Scott also relies upon the fact that Scott's employment file contains "no negative reviews, no negative e-mails, no concerns with production, no evidence of customer complaints, and no reprimands." (Pl.'s Br. at 12.) Finally, Scott has also produced evidence that he was replaced by a white woman. *See Carson v. Bethlehem Steel*, 82 F.3d 157, 159 (7th Cir. 1996) (stating [t]hat [if the plaintiff's] replacement is of another race . . . [that fact] may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition.").

Taking these facts in a light most favorable to the plaintiff, this court concludes that Scott has not established a "convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination. Scott argues that, in light of Weber's racial slur and Hodgden's comment in May of 2003 that "he is not Jim Weber," a reasonable jury could *infer* both that prior

---

[4] Scott also relies upon the fact that Hodgden's alleged "summary of action items" e-mail and his alleged follow-up e-mails to Scott were never produced (despite various attempts by H&R Block's IT department), as support for his "mosaic" of circumstantial evidence. (Pl.'s Br. at 12.)

22

to May of 2003, Weber and Hodgden met and that they decided that Hodgden should terminate Scott because he is black.  (Pl.'s Br. at 13.)  Racial slurs or racial epithets "*may* be . . . circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decision-maker, or those who influence the decision-maker, and made close in time to the adverse employment decision."  *Dandy*, 388 F.3d at 272 (emphasis added).  In this case, although the alleged racial slur was arguably made by someone who could influence the decision-maker, the racial slur was made over four months before Scott was terminated.  Thus, the alleged racial slur was not made "close [enough] in time to the adverse employment decision," for it to constitute circumstantial evidence of intentional discrimination.  *Id.*  Moreover, because the remaining circumstantial evidence in the "mosaic" does not "point *directly* to a discriminatory reason for the employer's action," this court concludes that no reasonable jury could infer intentional discrimination from the circumstantial evidence Scott has presented.  *Adams*, 324 F.3d at 939 (emphasis added).

Because Scott has failed to produce sufficient evidence under the "direct" method, Scott must proceed under the familiar burden-shifting paradigm set forth in *McDonnell Douglas*.  To reiterate, under *McDonnell Douglas*, Scott must first establish a prima facie case by demonstrating that he is a member of a protected class, that he was meeting his employer's legitimate performance expectations, that he suffered an adverse employment action, and that he was treated less favorably than similarly situated individuals who are not members of a protected class. *See Ineichen*, 410 F.3d at 959.

H&R Block does not dispute that Scott, who is African American, is a member of a protected class and that he suffered an adverse employment action when his employment was terminated.

23

(Def.'s Br. at 4.) In other words, Scott has satisfied the first and third prongs of a prima facie case. However, H&R Block argues that Scott has failed to satisfy the second and fourth prongs, i.e., Scott has not demonstrated that, at the time of his termination, he was meeting his employer's legitimate performance expectations, nor has he demonstrated that H&R Block treated similarly situated people outside the protected class more favorably than he. This court will address the latter inquiry first, as this court finds the fourth prong dispositive of Scott's claim, and if Scott fails to establish either prong, his claim must fail. *Bio*, 424 F.3d at 596 (stating that the "failure to establish any one of the initial four elements [of a prima facie case] defeats a discrimination claim").

To withstand summary judgment, Scott must show, among other things, that he was treated less favorably than a similarly situated employee who was not a member of a protected class. To establish that an employee is "similarly situated," an employee must be "'directly comparable [to the plaintiff] in *all material respects*.'" *Sartor v. Spherion Corp*., 388 F.3d 275, 279 (7th Cir. 2004) (emphasis added) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002)). In a disciplinary case such as this, "'in which the plaintiff claims he was disciplined more harshly than another employee based on a prohibited reason, the plaintiff must show that [he] is similarly situated with respect to performance, qualifications, and conduct.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (quoting *Radue*, 219 F.3d at 617). "'This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Radue*, 219 F.3d at 617-18).

At the time of Scott's demotion/termination, there were five Team Leaders, including Scott, in Hodgden's district. (Pl.'s Br. at 23.) However, only two other Team Leaders, besides Scott , were heading up "new" H&R Block branch offices: Brian Jones ("Jones") in the St. Louis, MO branch office and Scott Harer ("Harer") in the Minnetonka, MN branch office. (Pl.'s Br. at 23.) Jones and Harer are white males. (Pl.'s Br. at 24.) Thus, Scott has established that Jones, Harer, and Scott had the same supervisor, Hodgden, and were subject to the same standards, as Team Leaders of "new" branch offices. Scott, however, has not produced any evidence showing that Jones or Harer, or any other employee for that matter, engaged in conduct that is similar to the conduct Scott is alleged to have engaged in, and was not demoted/terminated for engaging in that conduct.

Scott need not produce evidence establishing that a non-minority employee engaged in conduct that is *identical* to the conduct he is alleged to have engaged in. *See Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005) (emphasis added). Yet, to withstand the defendant's motion for summary judgment, Scott must produce *some* evidence showing that at least one other employee engaged in conduct that is arguably *similar* to the conduct that he is alleged to have engaged in and was not demoted/terminated for engaging in that conduct. *Id.* Simply stated, Scott has presented no evidence that Jones or Harer, or any other Team Leader for that matter, engaged in conduct that is similar to that which he is alleged to have engaged in and was not demoted/terminated for engaging in that conduct.

Rather, Scott argues that his alleged misconduct, "which Hodgden claims differentiate[s] Scott from [the other] team leaders,"is not supported by "independent evidentiary support or documentation in the record." (Pl.'s Br. at 24.) Thus, Scott appears to be arguing that he never engaged in the alleged conduct and, therefore, Scott and the other Team Leaders are similarly

25

situated. Yet, under this prong of the *McDonnell Douglas* test, whether Scott did in fact engage in the alleged conduct is irrelevant. Indeed, under this prong, the court's inquiry is limited to determining whether the plaintiff has presented sufficient evidence from which a reasonable jury could conclude that non-minority employees engaged in conduct that is arguably similar to the conduct that Scott is alleged to have engaged in, and those non-minority employees were treated more favorably than Scott. Scott need not admit that he engaged in the conduct that allegedly led to his demotion/termination. However, to establish a prima facie case, he must produce *some* evidence showing that other employees engaged in similar conduct and were treated more favorably than he. *Radue*, 219 F.3d at 617-18. Because Scott has not put forth evidence from which a reasonable jury could conclude that he was treated less favorably than a similarly situated employee who is not a member of a protected class, he has failed to establish a prima facie case, and summary judgment is proper for this reason alone.

Scott also argues that because the Milwaukee branch office was the only new office with a profit at the close of the quarter during which Scott was fired, Scott was treated less favorably than Jones and Harer. (Pl.'s Br. at 23.) Specifically, Scott argues that because Hodgden stated that Scott was demoted/terminated for "production reasons" and the Milwaukee branch showed a "profit" for the quarter during which he was fired, the articulated reasons for Scott's termination must be a lie.[5] This argument, however, goes to the question of pretext, an issue this court does not reach until Scott

_____

[5] The parties are in dispute as to whether "production" means "profitability." And, even assuming "production" does mean "profitability," the parties are in dispute as to whether the "profit" upon which Scott relies is merely a "paper profit" that does not adequately reflect the Milwaukee branch office's performance that quarter or whether it adequately reflects Scott's performance as Team Leader. (Def.'s Br. at 17-18.)

26

has made out his prima facie case. Because Scott has not established a prima facie case, this court need not reach the issue of pretext.

## IV. CONCLUSION AND ORDER

In conclusion, whether this court agrees with the fairness or wisdom of the defendant's decision to demote/terminate Scott's employment is of no moment.[6] This court's duty (and power) is limited to deciding, taking the facts in a light most favorable to the plaintiff, whether the plaintiff has presented sufficient evidence from which a reasonable jury could find that the defendant's decision to demote/terminate Scott was impermissibly based upon Scott's race. For the reasons set forth above, this court concludes that no reasonable jury could find that it was.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**SO ORDERED** this  27th  day of December 2005, at Milwaukee, Wisconsin.


_____     /s/ William E. Callahan, Jr.
                                         WILLIAM E. CALLAHAN, JR.
                                         United States Magistrate Judge



_____

[6] As the Seventh Circuit has stated repeatedly, this court is not a "'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003)).